O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EMPLOYERS INSURANCE COMPANY OF WAUSAU, | ) ) ) | Case No. EDCV 10-00810 VAP(DTBx) |
| Plaintiff, | ) ) | **ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;** |
| v. | ) ) | **AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY** |
| LEXINGTON INSURANCE COMPANY, | ) ) ) | **JUDGMENT** |
| Defendants. | ) ) ) | **[Motions filed on July 7, 2014]** |

This insurance coverage dispute arises out of a fatal accident at a construction site that occurred when a concrete pump boom fell down and struck several workers. At the time of the accident, the insured, Rick Concrete Construction ("Rick Concrete"), had an automotive liability policy with Plaintiff, Employers Insurance Company of Wausau ("Plaintiff" or "Wausau"), and a general commercial liability policy with Defendant, Lexington Insurance Company ("Defendant" or "Lexington"). Wausau agreed to defend Rick Concrete against the state court personal injury and subrogation claims arising out of this accident.   Eventually, Wausau settled all claims

brought by the injured workers, the family of the
deceased worker, and the State Worker's Compensation
Fund.  Lexington refused to defend Rick Concrete on the
basis that the accident was not covered under its general
commercial liability ("CGL") policy.  Wausau now seeks an
equitable contribution from Lexington for the costs of
defending and settling the claims against Rick Concrete.

Before the Court are Wausau's and Lexington's cross-
Motions for Summary Judgment.  The matter came before the
Court for hearing on August 11, 2014.  After reviewing
and considering all papers filed in support of, and in
opposition to, the Motions, and the arguments advanced at
the hearing, the Court DENIES Plaintiff Wausau's Motion
and GRANTS Defendant Lexington's Motion.

## I.  BACKGROUND

On February 10, 2006, Jairo Herredia Guillen died,
and three other workers were injured, in an accident on a
construction site in Murrieta, California ("accident").
The workers were struck by a concrete pump boom that
suddenly fell to the ground, crushing Mr. Guillen and
injuring the other workers.  On March 13, 2007, Mr.
Guillen's family filed a wrongful death action against
Rick Concrete in the California Superior Court for the

1 County of Riverside ("Guillen Action").[1]  Rick Concrete

2 tendered the Guillen Action to both Wausau and Lexington

3 and asked them to defend it in the suit.  Wausau agreed

4 to defend Rick Concrete under a reservation of rights,

5 but Lexington declined the tender on the basis the

6 accident fell under an "Auto Exclusion" in the CGL policy

7 and was not covered.

8

9    Wausau filed a suit for declaratory relief against

10 Rick Concrete in the California Superior Court for the

11 County of San Diego ("State Court Action").[2]  In the

12 State Court Action, Wausau sought a declaratory judgment

13 that its automotive policy with Rick Concrete does not

14 provide coverage for the accident.  Rick Concrete filed a

15 cross-complaint against Wausau, Lexington, and a third

16 company, Driver Alliant Insurance Services, Inc.

17 ("Driver"), for, inter alia, breach of contract and

18 breach of the covenant of good faith and fair dealing

19 based on the insurance companies' responses to Rick

20 Concrete's tender of the wrongful death action.

21

22 _____

23 [1]Ana B. Guillen, et al v. Rick Concrete Construction
et al, No. RIC46744 (Mar. 13, 2007 Riverside Super. Ct.).

24 The injured workers, Jose Zamorano, Tomas Flores, and
Hector Lievanos, and the State Compensation Insurance

25 Fund also filed actions for damages against Rick
Concrete.  (Allen Declaration ("Allen Decl.") ¶ 3.)  All

26 of these actions are collectively referred to as the
"Guillen Action."

27 [2]Employers Insurance Company of Wausau v. Rick
Concrete Construct et al, No. 37-2007-00071934-CU-IC-CTL

28 (July 27, 2007 San Diego Super. Ct.).

1    Lexington subsequently filed a complaint in intervention
2    against Wausau seeking a judicial determination of
3    Wausau's duty to defend Rick Concrete in the <u>Guillen</u>
4    Action.
5
6        On July 30, 2008, the San Diego Superior Court issued
7    a statement of decision finding that the accident fell
8    within Wausau's automotive insurance policy.  On July 1,
9    2010, the San Diego Superior Court issued a final
10   judgment addressing Wausau's declaratory relief action,
11   as well as Rick Concrete's cross-complaint.  (Ex. I to
12   Clairborne Decl. ("Super. Ct. Judgment").)  Wausau
13   appealed this decision.
14
15       Meanwhile, on June 2, 2010, Wausau filed this action
16   against Lexington seeking declaratory relief in the form
17   of a judicial determination of "the parties' rights and
18   responsibilities" in regard to the <u>Guillen</u> Action.
19   ("Complaint" or "Compl." (Doc. No. 1) ¶ 4.)  Wausau
20   claims that Lexington owes the primary duty to defend and
21   indemnify Rick Concrete, and seeks reimbursement from
22   Lexington for the costs of defending and settling the
23   <u>Guillen</u> Action.  (<u>Id.</u> ¶¶ 5-6.)
24
25       On January 11, 2011, the Court stayed this action
26   pending the resolution of the appeal in the State Court
27   Action.  (<u>See</u> "Minute Order (1) Granting Defendant's
28

Motion to Stay the Action; (2) Granting Defendant's
Motion to Dismiss Plaintiff's Claim for Attorneys' Fees;
and (3) Denying Defendant's Motion in all Other Respects"
("Stay Order")(Doc. No. 16).)  On March 8, 2013, the
California Court of Appeal issued its decision in the
State Court Action.  (Ex. M to Clairborne Decl. ("COA
Op.").)[3]  The Court of Appeal affirmed the Superior
Court's finding that the Wausau Policy covered the
accident.

On April 7, 2014, the Court lifted the stay on this
action and set a briefing schedule for cross-motions for
summary judgment.  On July 7, 2014, Wausau filed a Motion
for Summary Judgment ("Pl.'s Mot.") (Doc. No. 38).  In
support of its Motion, Wausau submitted the following
documents:

- Statement of Uncontroverted Facts ("PSUF") (Doc. No. 38-5);
- Compendium of Evidence ("Pl.'s COE") (Exs. 1-17) (Doc. No. 38-7 - 38-10) and the Declaration of Dale Amato ("Amato Decl.") (Doc. No. 38-2);
- Declaration of Lorrie Isaac ("Isaac Decl.") (Doc. No. 38-3);
- Request for Judicial Notice ("PRJN") (Doc. No 38-4).

---

[3]Employers Ins. Co. of Wausau v. Rick Concrete Construction, No. D058134 (Mar. 8, 2013 Cal. Ct. App.).

1       Lexington filed an Opposition to Wausau's Motion on
2   July 21, 2014 ("Def.'s Opp'n")(Doc. No. 41).   In support
3   of its Opposition, Lexington filed a Statement of Genuine
4   Issues and its Separate Statement of Undisputed Facts
5   ("DSGI") (Doc. No. 41-4) and the Declaration of Michael
6   Clairborne in Support of the Request for Additional Time
7   to Take Discovery Under Federal Rule of Civil Procedure
8   56(d) ("FRCP 56(d) Decl.") (Doc. No. 41-1).   Wausau filed
9   a Reply on July 28, 2014 ("Pl.'s Reply") (Doc. No. 43).
10
11      Lexington also filed a Motion for Summary Judgment
12  ("Def.'s Mot.") on July 7, 2014.   In support of its
13  Motion, Lexington submitted the following documents:
14     •    Statement of Undisputed Facts ("DSUF") (Doc. No.
15          39-2);
16     •    Declaration of Michael Clairborne ("Clairborne
17          Decl.") (Doc. No 39-3) and Exhibits A-M;
18     •    Request for Judicial Notice ("DRJN") (Doc. No.
19          39-17) and Exhibits 1-3.
20
21      Wausau filed an Opposition to Lexington's Motion on
22  July 21, 2014 ("Pl.'s Opp'n") (Doc. No. 40).   In support
23  of its Opposition, Wausau filed a Response to Lexington's
24  Statement of Undisputed Facts, (Doc. No. 40-1), a
25  Supplemental Request for Judicial Notice (Doc. No. 40-
26
27
28

1  2)[4], and Exhibits 1-4.  On July 28, 2014, Lexington filed
2  a Reply ("Def.'s Reply") (Doc. No. 42).

3

4                      **II.  LEGAL STANDARD**

5      A court shall grant a motion for summary judgment
6  when there is no genuine dispute as to any material fact
7  and the moving party is entitled to judgment as a matter
8  of law.  Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty</u>
9  <u>Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  The moving
10 party must show that "under the governing law, there can
11 be but one reasonable conclusion as to the verdict."
12 <u>Anderson</u>, 477 U.S. at 250.

13

14     Generally, the burden is on the moving party to
15 demonstrate that it is entitled to summary judgment.
16 <u>Margolis v. Ryan</u>, 140 F.3d 850, 852 (9th Cir. 1998)
17 (citing <u>Anderson</u>, 477 U.S. at 256-57; <u>Retail Clerks</u>

18 _____

19     [4]The parties filed three different requests for
   judicial notice.  Many of the requests are related to
20 various court documents, including filings, court orders,
   discovery, documents introduced at trial, and transcripts
21 of trial testimony from the two state court actions and
   this action.  The court may "take notice of proceedings
22 in other courts, both within and without the federal
   judicial system, if those proceedings have a direct
23 relation to matters at issue."  <u>U.S. ex rel. Robinson</u>
   <u>Rancheria Citizens Council v. Borneo, Inc.</u>, 971 F.2d 244,
24 248 (9th Cir. 1992).  Accordingly, the Court takes
   judicial notice of these documents as they are all
25 related to proceedings which have a direct relation to
   this action.  In addition, although the Court may take
26 judicial notice of the insurance policies Wausau and
   Lexington issued to Rick Concrete, it is not necessary as
27 the Court may consider and rely on properly authenticated
   documents in the record in deciding a motion for summary
28 judgment.

1  Union Local 648 v. Hub Pharmacy, Inc., 707 F.2d 1030,
2  1033 (9th Cir. 1983).  The moving party bears the initial
3  burden of identifying the elements of the claim or
4  defense and evidence that it believes demonstrates the
5  absence of an issue of material fact.  Celotex Corp. v.
6  Catrett, 477 U.S. 317, 323 (1986).

7

8      Where the moving party has the burden at trial, "that
9  party must support its motion with credible
10 evidence . . . that would entitle it to a directed
11 verdict if not controverted at trial."  Celotex, 477 U.S.
12 at 331.  The burden then shifts to the non-moving party
13 "and requires that party . . . to produce evidentiary
14 materials that demonstrate the existence of a 'genuine
15 issue' for trial."  Id.; Anderson, 477 U.S. at 256; Fed.
16 R. Civ. P. 56(a).

17

18     Where the non-moving party has the burden at trial,
19 however, the moving party need not produce evidence
20 negating or disproving every essential element of the
21 non-moving party's case.  Celotex, 477 U.S. at 325.
22 Instead, the moving party's burden is met by pointing out
23 that there is an absence of evidence supporting the
24 non-moving party's case.  Id.  The burden then shifts to
25 the non-moving party to show that there is a genuine
26 dispute of material fact that must be resolved at trial.
27 Fed. R. Civ. P. 56(a); Celotex, 477 U.S. at 324;
28

<u>Anderson</u>, 477 U.S. at 256.  The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial.  <u>Celotex</u>, 477 U.S. at 322; <u>Anderson</u>, 477 U.S. at 252.  <u>See also</u> William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, <u>Federal Civil Procedure Before Trial</u> § 14:144.

A genuine issue of material fact will exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson</u>, 477 U.S. at 248.  In ruling on a motion for summary judgment, a court construes the evidence in the light most favorable to the non-moving party.  <u>Scott v. Harris</u>, 550 U.S. 372, 378, 380 (2007); <u>Barlow v. Ground</u>, 943 F.2d 1132, 1135 (9th Cir. 1991); <u>T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630-31 (9th Cir. 1987).

### III.  FACTS

The following facts are either undisputed by the parties, or the Court deems them undisputed for the reasons noted.

**A.  The Accident**

On June 27, 2005, Rick Concrete leased a 1995 "concrete pumper truck."[5]  (DSUF ¶ 18.)  The concrete

---

[5]The Rental Agreement describes the "equipment" as a
(continued...)

1  pumper truck is a single, self-propelled unit consisting

2  of a tractor and a trailer, which is also referred to as

3  a "pump" or "pumper."  The tractor and trailer are

4  designed to operate together as one unit to place

5  concrete at construction sites.  (DSUF ¶¶ 20, 21.)[6]  The

6  concrete pumper truck is able to travel on the highway.

7  (DSUF ¶¶ 21, 23.)  The tractor of the unit acts as

8  counterweight for the trailer when the "boom"[7] is

9  deployed and the trailer is in pumping mode.  (DSUF ¶

10  26.)[8]

11

12      On February 10, 2006, the concrete pumper truck was

13  being used at the Wynfield construction site in Murrieta.

14  (DSUF ¶ 29.)[9]  Howard Drew drove the concrete pumper

15  _____

16      [5](...continued)
17  1994 BSS52-16H Concrete Pump with a 1995 Kenworth Tractor
    Model.  (Ex. B to Clairborne Decl.)

18      [6]Wausau argues that the concrete pumper truck's
19  primary purpose is to "place concrete on construction
    sites, but it is also designed to travel on roadways to
20  get to and from construction sites," but does not dispute
    that the concrete pumper truck is a single unit
21  consisting of a tractor and trailer designed to operate
    together or that the unit can travel on the highway.

22      [7]The "boom" is a long cylinder or crane through which
23  the concrete is pumped from the trailer to the location
    where the concrete is poured.  (See Ex. 1 to Pl.'s COE at
24  6, 9.)

25      [8]Wausau again argues that the primary purpose of the
26  concrete pumper truck is to place concrete on
    construction sites, but does not dispute that the tractor
    functions as a counterweight.

27      [9]Wausau objected to Lexington's DSUF ¶ 29, which
28  states, "On February 10, 2006, Howard Drew drove the
                                        (continued...)

1   truck to the edge of the paved roadway at the

2   construction site and parked the truck in order to pour

3   concrete onto lot 14.  (DSUF ¶ 30; Ex. D to Clairborne

4   Decl. ("Cal/OSHA Report") at 0144.)  After the truck was

5   parked, the four "outriggers"[10] of the concrete pumper

6   truck were extended in order to stabilize the truck so

7   that the concrete boom could be extended and concrete

8   poured.  (DSUF ¶ 30.)  Three of the outriggers were

9   placed on asphalt; however, the fourth outrigger on the

10  front left side of the truck was placed on soil.  (DSUF

11  ¶¶ 31, 32.)

12

13      According to the report prepared by Terry Saville,

14  the accident investigator from the California Division of

15  Occupational Safety and Health ("Cal/OSHA"), the soil

16  under the fourth outrigger was not properly compacted.

17  (Cal/OSHA Report at 0145-46.)  The soil had not been "de-

18  grubbed" and re-compacted appropriately, and thus was not

19  capable of supporting the weight of the outrigger.  (DSUF

20  ¶ 33; Cal/OSHA Report at 0146.)  The concrete pumper was

21  _____

22      [9](...continued)
    concrete pumper truck to the subject jobsite where the
23  accident took place" on the basis that the evidence does
    not support the assertion that the concrete pumper truck
24  was driven onto the jobsite on February 10, 2006.
    Instead, the work on the jobsite commenced on February 9,
25  2006, and the concrete pumper truck was driven from one
    location in the jobsite to the location of the accident
26  on February 10, 2006.

27      [10]An "outrigger" appears to be a metal leg that
    extends out horizontally from the truck and is placed on
28  the ground in order to stabilize the truck while pumping
    concrete.  (See Ex. 1 to Pl.'s COE at 4, 9.)

1  in operation for approximately two hours without
2  incident. (DSUF ¶ 34; Cal/OSHA Report at 0144.)  About
3  three-quarters of the way through the concrete pouring
4  job on lot 14, Mr. Drew, the concrete pumper truck
5  operator, was instructed to stop pumping concrete and
6  reposition the concrete boom so that it was extended to
7  its maximum length. (DSUF ¶¶ 34, 37; Cal/OSHA Report at
8  144-45.)  Although concrete was no longer pouring out of
9  the boom, there was concrete in the delivery pipe
10  attached to the boom as it was being extended. (Ex. C.
11  to Clairborne Decl. ("Super. Ct. Trial Transcript") at
12  0117; Cal/OSHA Report at 0143.)  When the concrete boom
13  was extended the soil underneath the fourth outrigger was
14  unable to support the load, and the outrigger "knifed"
15  into the ground. (DSUF ¶ 35; Cal/OSHA Report at 144-
16  45.)[11]  The outrigger sank approximately five feet into
17  the ground, causing the weight of the concrete pumper
18  truck to shift, in turn causing the concrete boom to fall
19  to the ground suddenly. (DSUF ¶ 36; Cal/OSHA Report at
20  0140, 0144-45.)  The concrete boom fell on four
21  employees, fatally injuring Mr. Guillen and causing
22  serious injuries to Mr. Zamorano, Mr. Flores, and Mr.
23  Lievanos.

24

25          [11]Wausau objects to Lexington's description that the
26  soil "gave way" causing the outrigger to "sink into the
   ground" on the basis that the outrigger actually
27  "punctured through the dirt soil."  The Court has
   modified the language to mirror the description provided
28  in the Cal/OSHA Report, but notes that the Report does
   describe the movement of the outrigger as "sank."

On March 13, 2007, the family of Mr. Guillen filed a wrongful death action against Rick Concrete.  (DSUF ¶ 40.)  On May 4, 2007, Rick Concrete tendered the <u>Guillen</u> Action to Wausau and Lexington.  (PSUF ¶¶ 7, 9.)  Wausau agreed to defend Rick Concrete, but Lexington refused.  (PSUF ¶¶ 8, 10.)  Wausau paid $602,574.46 to defend Rick Concrete in the <u>Guillen</u> Action.  (PSUF ¶ 11.)  Wausau paid $965,000.00 to settle the <u>Guillen</u> Action on behalf of Rick Concrete.  (PSUF ¶ 12.)

**B.   Insurance Policies**

   **1.   Wausau Policy**

Wausau issued a Commercial Auto Insurance policy to Rick Concrete for coverage from February 22, 2005 to February 22 2006 ("Wausau Policy" or "automotive policy").[12]  (PSUF ¶ 1; DSUF ¶ 1.)  The Wausau Policy provides liability coverage for "all sums an 'Insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this Insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'"  (PSUF ¶ 2; DSUF ¶ 1.)  The Wausau Policy has a limit of $1,000,000.00 for "any one accident or loss."  (DSUF ¶ 1; Ex. A to Clairborne Decl. ("Wausau Policy") at 0009.)

---

[12]Policy Number ASC-Z91-543219-035.

The Wausau Policy defines an "auto" as a "land motor vehicle, 'trailer' or semitrailer designed for travel on public roads but does not include 'mobile equipment.'" (DSUF ¶ 6.) "Mobile Equipment" is defined with six sub-parts. The relevant sub-part of the definition of "Mobile Equipment" states:

> "Mobile equipment" means any of the·following types of land vehicles, including any attached machinery or equipment:
>
> 6. Vehicles not described in Paragraphs 1., 2., 3. or 4. above maintained primarily for purposes other than the transportation of persons or cargo. However; self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":
>
> a. Equipment designed primarily for:
>
> (1) Snow removal;
>
> (2) Road maintenance, but not construction or resurfacing; or
>
> (3) street cleaning;
>
> b. Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and
>
> c. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well servicing equipment.

1    (DSUF ¶ 9; Wausau Policy at 0097.)

2

3    The Wausau Policy contains an "Operations" exclusion

4    which excludes coverage for: "'Bodily injury' or

5    'property damage' arising out of the operation of any

6    equipment listed in Paragraphs 6.b. and 6.c. of the

7    definition of 'mobile equipment.'"  ("Operations

8    Exclusion") (PSUF ¶ 2; DSUF ¶ 10.)

9

10    Finally, the Wausau Policy also includes an "Other

11   Insurance" clause, which states in relevant part:

12        5.   Other Insurance

13             a.   For any covered "auto" you own, this

14        Coverage Form provides primary insurance.  For

15        any covered auto you don't own, the insurance

16        provided by this Coverage Form is excess over

17        any other collectible Insurance.

18

19             d.   When this Coverage Form and any other

20        Coverage Form or policy covers on the same

21        basis, either excess or primary, we will pay

22        only our share.  Our share is the proportion

23        that the Limit of Insurance of our Coverage Form

24        bears up to the total of the limits·of all the

25        Coverage Forms and policies covering on the same

26        basis.

27   (Wausau Policy at 0096.)

28

1      **2. Lexington Policy**

2          Lexington issued a Commercial General Liability

3  Policy for coverage from February 22, 2005 to February

4  22, 2006 ("Lexington Policy" or "CGL Policy").[13]  (PSUF ¶

5  3; DSUF ¶ 12.)  The Lexington Policy provides coverage

6  for "those sums that the insured becomes legally

7  obligated to pay as damages because of 'bodily injury' or

8  'property damages' to which this insurance applies."

9  (PSUF ¶ 4; DSUF ¶ 12.)  There is a liability limit of

10  $2,000,000.00 for each occurrence covered under the

11  policy.[14]  (PSUF ¶ 3; DSUF ¶ 12.)  Lexington has a right

12  and a duty to defend Rick Concrete against any "suit"

13  seeking damages covered under the policy.  (DSUF ¶ 12.)

---

15      [13]Policy Number 1138416.

16      [14]Lexington lists the policy limit as $2,000,000.00
in its separate statement of undisputed material facts in
opposition to Wausau's Motion; but lists the policy limit
as $1,000,000.00 in its statement of undisputed facts
submitted in support of its Motion.  (See DSGI ¶ 12; DSUF
¶ 12.)  The Lexington Policy states that there is an
"each occurrence limit" of $2,000,000.00, and a "personal
and advertising injury limit" of $1,000,000.00.  Under
the definitions provided in the Lexington Policy the
personal and advertising injury limit would not apply to
the underlying claim in this case.  (See Section IV(13)
of the Lexington Policy defining "occurrence" as an
"accident; including continuous or repeated exposure to
substantially the same general harmful conditions" and
Section IV(14) of the Lexington Policy defining "Personal
and Advertising Injury" as an injury arising out of one
of the following offenses: false arrest, detention or
imprisonment; malicious prosecution; the wrongful
eviction; slander or libel of a person or organization or
a person's or organization's goods, products or services;
violations of a person's right of privacy; the use of
another's advertising idea in your advertisement; and
infringing upon another's copyright, trade dress or
slogan in your advertisement (Ex. A to DRJN ("Lexington
Policy") 0025, 0027.)  Accordingly, the applicable policy
limit is $2,000,000.00

The Lexington Policy has an "Aircraft, Auto, or Watercraft" exclusion ("Auto Exclusion") which applies in relevant part to:

> "Bodily injury" or "property damage" arising out
> of the ownership, maintenance, use or
> entrustment to others of any . . ."auto" . . .
> owned or operated by or rented or loaned to any
> insured.  Use includes operation and "loading or
> unloading."

> This exclusion applies even if the claims
> against any insured allege negligence or other
> wrongdoing in the supervision, hiring,
> employment, training or monitoring of others by
> that insured, if the "occurrence" which caused
> the "bodily injury" or "property damage"
> involved the ownership, maintenance, use or
> entrustment to others of any . . . "auto" . . .
> that is owned or operated by or rented or loaned
> to any insured.

(PSUF ¶ 4; DSUF ¶ 13; Ex. A to DRJN ("Lexington Policy") at 0014.)

In the Lexington Policy an "auto" is defined as a "land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery

1    or equipment.  But 'auto' does not include 'mobile

2    equipment.'"  (Lexington Policy at 0025.)

3

4        The Lexington Policy has an "Operations Exception" to

5    the Auto Exclusion which provides that the exclusion does

6    not apply to: "'Bodily injury' or 'property damage'

7    arising out of the operation of any of the equipment

8    listed in paragraph f.(2) or f.(3) of the definition of

9    'mobile equipment'".  (PSUF ¶ 4.)

10

11       Under the Lexington Policy "Mobile Equipment" is

12   defined in six sub-parts, (a)-(f).  In subpart f.(2) and

13   f.(3) "Mobile Equipment" is defined as:

14        12.  "Mobile Equipment" means "any of the

15        following types of land vehicles, including any

16        attached machinery or equipment"

17        f. Vehicles not described in a., b., c. or

18        d. above maintained primarily for purposes other

19        than the transportation of persons or cargo.

20        However, self-propelled vehicles with the

21        following types of permanently attached

22        equipment are not "mobile equipment" but will be

23        considered "autos":

24             (2) Cherry pickers and similar devices

25        mounted on automobile or truck chassis and used

26        to raise or lower workers; and

27             (3) Air compressors, pumps and

28        generators, including spraying, welding,

1   building cleaning, geophysical exploration,
2   lighting and well servicing equipment.
3   (PSUF ¶ 4; DSUF ¶ 14; Lexington Policy at 0027.)
4
5   The Lexington Policy is modified by "Endorsement #
6   004" which contains a "Subsidence Exclusion" stating:
7
8        This policy does not provide coverage and
9        the Company (or Insurer or We, if applicable)
10       will not pay any defense expenses, claim
11       expenses and/or any damages or losses, or any
12       other loss,·cost or expense, including, but not
13       limited to losses, costs, or expenses related
14       to, arising out of, based upon, attributable to,
15       associated with, caused directly or indirectly
16       by, or contributed to, or aggravated by
17       "subsidence" regardless of any other cause,
18       event, material, product and/or building
19       component that contributed concurrently or in
20       any sequence to that loss, cost or expense or to
21       such defense expenses, claim expenses and/or any
22       damages or losses.
23
24       For the purpose of this exclusion, the
25       following definitions are added to the policy:
26       "Subsidence" means earth movement of any kind
27       whatsoever, including, but not limited to
28       earthquake, landslide, "mine subsidence,"

"sinkhole collapse," earth sinking; rising or
shifting, mud flow, expansion, contraction,
consolidation, freezing, thawing, settling,
falling away, caving in, eroding, flowing,
tilting, or other movement,·of land, earth or
mud.

"Mine Subsidence" means subsidence of a man-made
mine, whether or not mining activity has ceased.

"Sinkhole Collapse" means loss or damage caused
by the sudden sinking or collapse of land into
underground empty spaces created by the action
of water on limestone or dolomite.

Finally, the Lexington Policy includes "Other
Insurance" clause which is within Section V, "CONDITIONS"
of the Policy.  The relevant part of the Other Insurance
clause states:

4.  If other valid and collectible insurance is
available to the insured for a loss we cover
under Coverages A or B of this Policy, our
obligations are limited as follows:

a. Primary Insurance
    This insurance is primary except when b.
Excess Insurance, below, applies. If this

insurance is primary, our obligations are not
affected unless any of the other insurance is
also primary.  Then, we will share with all that
other insurance by the method described in c.
Method of Sharing, below.

b. Excess Insurance

    This insurance is excess over:

  (1) Any of the other insurance, whether
primary, excess, contingent or on any other
basis:

     (d) If the loss arises out of the
maintenance or use of aircraft, "autos" or
watercraft to the extent not subject to
Exclusion g. of SECTION I - COVERAGES, COVERAGE
A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY.

    When this insurance is excess, we will have
no duty under Coverages A or B to defend the
insured against any "suit" if any other insurer
has a duty to defend the insured against that
"suit".  If no other insurer defends, we will
undertake" to do so, but we will be entitled to
the insured's rights against all those other
insurers.

(DSUF ¶ 17; Lexington Policy at 0030-31.)

# IV.   DISCUSSION

## A.   Wausau's Obligations Under the Automotive Policy

In its Complaint, Wausau alleges it is not obligated to defend and indemnify Rick Concrete because its automotive policy did not provide coverage, and instead Lexington had the "primary (or exclusive)" responsibility for defending and indemnifying Rick Concrete.  (Compl. ¶¶ 19, 28.)  Wausau's obligations under the automotive policy have already been litigated in the State Court Action.  In March 2013 the Court of Appeal affirmed the Superior Court's ruling that the accident is covered under Wausau's policy because (1) the concrete pumper truck is an "auto" as defined under the Policy; and (2) the Operations Exclusion of the Policy does not apply.

In staying this action, the Court noted that it would respect the factual and legal determinations already made in the State Court Action and will abide by California's collateral estoppel and res judicata principles for all issues that were previously litigated in state court. (Stay Order at 10.)

1    Accordingly, as Wausau concedes,[15] this Court is
2  precluded from considering whether Wausau has any
3  obligations under its policy, as that issue has already
4  been decided in the State Court Action.  The State Court
5  Action did not decide whether Lexington also had a duty
6  to defend and indemnify Rick Concrete.  Thus, the only
7  issues before this Court are (1) whether Lexington also
8  had a duty to defend to Rick Concrete under the Lexington
9  Policy; and (2) if so, how much, if any, Lexington owes
10  Wausau as reimbursement for the costs Wausau incurred
11  defending and settling the claims against Rick Concrete.
12
13    Wausau advances two theories to support its argument
14  that the Lexington Policy also provides coverage for the
15  accident.  First, Wausau argues that the concurrent
16  causation doctrine applies because there were two causes
17  of the accident (1) the parking of the concrete pumper
18  truck; and (2) the extension of the concrete boom in
19  order to pour concrete in a more remote area of the
20  construction site.  Second, Wausau argues that the
21  Lexington Policy provides coverage under the Operations
22  Exception to the Auto Exclusion.
23
24

25    [15]Although acknowledging in its Opposition and Reply
26  briefs that the issue of coverage under the Wausau Policy
   has already been litigated, Wausau at times appears to
27  invite reconsideration of that issue by suggesting that
   Lexington be held "exclusively" or "100 percent"
28  responsible for costs of defending and settling the
   Guillen Action.  (See Pl.'s Mot. at 1, 3, 12.)

Lexington argues its CGL policy does not provide coverage for the accident because (1) the concurrent causation doctrine does not apply; (2) the State Court Action already determined that the accident "arose out of use of an auto," and that the accident did not "arise out of the operation of the pump" and thus the Lexington Operations Exception to the Auto Exclusion does not apply; (3) there is no coverage for the accident under the Subsidence Exclusion; and (4) even if there is coverage, the Lexington Policy is "excess." (See generally Def.'s Mot.)  In support of its final argument, Lexington requests additional discovery pursuant to Rule 56(d) in order to establish that the Lexington Policy is excess pursuant to California Insurance Code section 11580.9(d).

**B.   Concurrent Causation Doctrine**

Under the concurrent causation doctrine, when an injury is "caused jointly by an insured risk and by an excluded risk . . . the insurer is liable so long as one of the causes is covered by the policy."  State Farm Mut. Auto. Ins. Co. v. Partridge, 10 Cal. 3d 94, 102 (1973); Zurich Specialties London Ltd. v. Bickerstaff, Whatley, Ryan & Burkhalter, Inc., 650 F. Supp. 2d 1064, 1071 (C.D. Cal. 2009).

In Partridge, a passenger in a truck was injured by a shotgun in the truck that accidently discharged when the

driver of the truck, the insured, negligently drove his truck off road.  The shotgun discharged because the insured had filed down the gun's trigger, making it a "hair trigger" that reacted when the truck went over a bump.  The Supreme Court of California found that insured's automotive policy and homeowner's policy both provided coverage for the accident.  The Court reasoned that although the accident was caused by the negligent "use" of the auto, an excluded risk under the homeowner's policy, it was also caused by the negligent filing of the gun's trigger mechanism, which was an insured risk under the homeowner's policy.  Partridge, 10 Cal. 3d at 103.

Courts interpreting the language in Partridge have limited the concurrent causation doctrine to situations where there is an independent, non-auto related act of negligence that combines with an auto-related act of negligence.  See Medill v. Westport Ins. Corp., 143 Cal. App. 4th 819, 834-35 (2006) (the Partridge holding only applies to "multiple causes that operated totally independently of one another."); Prince v. United Nat. Ins. Co., 142 Cal. App. 4th 233, 239 (2006) (same); Daggs v. Foremost Ins. Co., 148 Cal. App. 3d 726, 730 (1983) ("in order for Partridge to apply there must be two negligent acts or omissions of the insured, one of which, independently of the excluded cause, renders the insured liable for the resulting injuries."); Allstate Ins. Co. v. Jones, 139 Cal. App. 3d 271, 275 (1983) ("when two,

1  independent, negligent acts concur to produce one injury,

2  each act should be viewed separately to determine policy

3  coverage.").

4

5      In the context of auto exclusions in homeowner's

6  policies, Courts have not found that there is an

7  "independent negligent act" when the second act, or risk,

8  is dependent on the ownership, maintenance, operation, or

9  use of a vehicle.  See State Farm Fire & Cas. Co. v.

10  Camara, 63 Cal. App. 3d 48, 52 (1976) (no concurrent

11  causation because negligent design modification of a dune

12  buggy arose out of the ownership and use of the vehicle

13  and a passenger could only be exposed to that risk if the

14  vehicle was in operation); Gurrola v. Great Sw. Ins. Co.,

15  17 Cal. App. 4th 65 (1993) (no concurrent causation when

16  insured negligently welded the chassis to the frame of

17  the vehicle because the only exposure to the risk was

18  through operation of the vehicle).

19

20      The Lexington Policy excludes coverage for accidents

21  arising out of the use of an auto.  Wausau has failed to

22  identify an independent, non-auto related negligent act

23  that caused the accident and is covered under the

24  Lexington Policy.  Wausau argues that the accident would

25  not have happened without the extension of the concrete

26  boom to its full length in preparation for the operation

27  of the concrete pumper truck to pour concrete.  Wausau

28  has not argued, however, that the actual extension of the

boom was negligent.  In Reply, Wausau argues that "perhaps" Rick Concrete was negligent in the distance the truck was parked in relation to the location of the concrete pour, the direction the boom was aimed, the speed used to extend the boom to its full length, the extension of the boom directly over the workers who were finishing concrete below the boom, and the failure to adhere to necessary safeguards and safety manuals at the site.  (Reply at 6-7.)  Wausau does not argue that any of these alleged acts of negligence, independent of the parking of the concrete pumper truck, would have caused any injury.  Accordingly, as there does not exist an independent, non-auto related negligent act, the concurrent causation doctrine does not apply.

**C.   Overlapping Coverage**

Overlapping coverage between automotive and CGL polices, although unusual, is not prohibited.  See Am. Star Ins. Co. v. Ins. Co. of the W., 232 Cal. App. 3d 1320, 1329 (1991) ("Insurers are loath to offer coverage for risks in CGL policies which are otherwise covered in general auto policies.").  Typically, business auto policies and CGL policies have reciprocal exclusions and identical definitions that serve to limit the possibility of dual coverage for the same type of incident.  Id. Here, for example, the Wausau and Lexington policies contain identical definitions of "auto" and "mobile equipment."  In addition, the language in Wausau Policy's

1  Operations Exclusion to auto coverage is identical to the
2  language in the Lexington Policy's Operations Exception
3  to its Auto Exclusion.   The Wausau automotive policy
4  provides coverage for accidents arising out of the use of
5  an "auto" and excludes coverage for "'Bodily injury' or
6  'property damage' arising out of the operation of
7  'pumps.'"   On the other hand, the Lexington CGL Policy
8  excludes coverage for accidents arising from the use of
9  an "auto," but provides coverage for "'Bodily injury' or
10  'property damage' arising out of the operation of any
11  'pumps'" through the Operations Exception to its Auto
12  Exclusion.[16]

13

14      Despite the similarities in the language of the
15  Wausau Operations Exclusion and the Lexington Operations
16  Exception, "an entirely different rule of construction
17  applies to exclusionary clauses as distinguished from
18  coverage clauses." Partridge, 10 Cal. 3d at 101.
19  "Whereas coverage clauses are interpreted broadly so as
20  to afford the greatest possible protection to the
21  insured, exclusionary clauses are interpreted narrowly
22  against the insurer."   Id. (internal citations omitted.);
23  TRB Investments, Inc. v. Fireman's Fund Ins. Co., 40 Cal.
24  4th 19, 27-28 (2006) (same).   "An exception to an

25  _____

26      [16]The actual language of the Wausau Operations
   Exclusion and the Lexington Operations Exception
27  references "the operation of any of the equipment listed
   in paragraph f.(2) or f.(3) of the definition of 'mobile
28  equipment.'"   Paragraph f.(3) of the definition of
   "mobile equipment" in both policies includes "pumps."

exclusion is treated in the same manner as a coverage
provision and therefore is interpreted broadly,
consistent with the insured's reasonable expectations."
Frontier Oil Corp. v. RLI Ins. Co., 153 Cal. App. 4th
1436, 1463 (2007); Aydin Corp. v. First State Ins. Co.,
18 Cal. 4th 1183, 1192 (1998) (same); Nat'l Union Fire
Ins. Co. v. Lynette C., 228 Cal. App. 3d 1073, 1082
(1991) ("exceptions to exclusions are somewhat analogous
to coverage provisions and we construe coverage
provisions broadly in favor of the insured; exclusions,
by contrast, are construed strictly against the
insurer."). Thus, "the fact that an accident has been
found to 'arise out of the use' of a vehicle for purposes
of an automobile policy is not necessarily determinative
of the question of whether that same accident falls
within a similarly worded exclusionary clause of a
homeowner's policy." Id.; see also Am. Star Ins. Co.,
232 Cal. App. 3d at 1329 ("the plain language of the
policy must control in this case, even if it means a CGL
policy and a non-CGL policy both provide coverage in this
instance.").

### 1.   Issue Preclusion

Lexington argues that the issue of whether the
accident "arose out of the operation of any pump" was
already decided in the State Court Action and thus Wausau
is collaterally estopped from raising the issue again.

"Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." <u>Allen v. McCurry</u>, 449 U.S. 90, 96 (1980). Accordingly, to determine the preclusive effect of the state court judgment, the court applies state law. <u>Sosa v. DIRECTV, Inc.</u>, 437 F.3d 923, 927 (9th Cir. 2006). Under California law, issue preclusion prevents "relitigation of issues argued and decided in prior proceedings." <u>Lucido v. Superior Court</u>, 51 Cal. 3d 335, 341 (1990). "The threshold requirements for issue preclusion are: (1) the issue is identical to that decided in the former proceeding, (2) the issue was actually litigated in the former proceeding, (3) the issue was necessarily decided in the former proceeding, (4) the decision in the former proceeding is final and on the merits, and (5) preclusion is sought against a person who was a party or in privity with a party to the former proceeding." <u>Castillo v. City of Los Angeles</u>, 92 Cal. App. 4th 477 (2001). When those requirements are met, the propriety of preclusion depends upon whether application will further the public policies of "preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation." <u>Lucido</u>, 51 Cal. 3d at 343.

        The Superior Court concluded that the accident "arose
out of parking the unit and the cause of the accident was
the shifting of center of gravity when the boom changed .
. . and the unit toppled over." (Super. Ct. Judgment at
5.)  The Superior Court noted that it was not "a
situation where someone was struck by pumped cement or
something like that.  The pump, in fact – the unit was
not pumping.  It was at the jobsite and it had been
pumping and it was in operation as a pumper but it was
not pumping." (Id.)  In reaching its conclusion
regarding the Operations Exclusion, the Superior Court
noted that it must construe the exclusion language
narrowly and resolve ambiguities in favor of the insured.
(Id. at 4, 5.)

        On appeal, Wausau argued that the Superior Court
construed the language, "arising out of the operation of
the pump" in the Operations Exclusion too narrowly. (See
Ex. L to Clairborne Decl. ("Wausau Appellate Brief") at
49-55.)  Specifically, Wausau argued that "arising out
of" is a phrase that is interpreted broadly, and that the
Superior Court erred in focusing on whether the pump was
actually pumping at the time of the accident.  Although
Wausau acknowledged the pump was not actually pumping
concrete at the time of the accident, Wausau argued that
the pumping was only temporarily stopped so that the
concrete boom could be repositioned in order to continue
pumping.  Wausau argued that repositioning the boom in

order to continue concrete pumping is an action that
"arises out of the operation of the pump," and thus the
Operations Exclusion should apply.

The Court of Appeal affirmed the Superior Court's
interpretation of the Operations Exclusion, noting that
the phrase "arising out of" is narrowly construed against
the insurer when used in an exclusion. (COA Op. at 49.)
The Court of Appeal noted that in interpreting the terms,
"the context in which they appear is critical" and that
although in a "broad sense the positioning of the boom
may be deemed part of the overall 'operation'" of the
pump, "the exclusion, by its express terms, requires us
to consider not the operation of any part of the covered
'auto,' but only the operation of the relevant equipment
listed in subparagraph 6.c. - *i.e.*, the pump.
Consequently, the trial court did not err in focusing on
whether the pump itself was operating at the time of the
accident." (COA Op. at 49, 50.)

Thus, the Court of Appeal's conclusion that the
accident did not "arise out of the operation of the pump"
for the purpose of Wausau's Operations Exclusion was
reached through a narrow construction of the language
against the insurer. This finding is thus not
"identical" to the question of whether the accident
"arose out of the operation of the pump" under
Lexington's Operations Exception, which is a coverage

provision that is construed broadly in favor of the
insured.

Accordingly, the Court is not bound by the finding in
the State Court Action and proceeds to analyze whether,
based on the undisputed facts before the Court, the
accident "arose out of the operation of the pump" under
the Lexington Policy's Operations Exception to the Auto
Exclusion.

**2.   Operations Exception**

In analyzing the terms of the provision, the Court
applies the general rules of contract interpretation and
interprets the policy to give effect to the "mutual
intention" of the parties.  <u>MacKinnon v. Truck Ins.
Exch.</u>, 31 Cal. 4th 635, 647 (2003).  The "clear and
explicit" meaning of an provision, interpreted in its
"ordinary and popular sense" generally governs.  <u>Id.</u>;
<u>Producers Dairy Delivery Co. v. Sentry Ins. Co.</u>, 41 Cal.
3d 903, 912 (1986).  If the plain language of the policy
is capable of two or more reasonable constructions, the
provision is "ambiguous."  <u>MacKinnon</u>, 31 Cal. 4th at 647.
"Language in a contract must be interpreted as a whole,
and in the circumstances of the case, and cannot be found
to be ambiguous in the abstract."  <u>Id.</u>  An ambiguous
insurance provision is construed broadly in favor of the
insured and in order to protect a reasonable expectation
of coverage.  <u>Id.</u>

The phrase "arising out of" is usually interpreted as requiring only a "minimal causal connection or incidental relationship" in order to establish insurance coverage. See Vitton Const. Co. v. Pac. Ins. Co., 110 Cal. App. 4th 762, 767 (2003) ("minimal causal connection will suffice to trigger coverage under an "arising out of" clause."); Fireman's Fund Ins. Companies v. Atl. Richfield Co., 94 Cal. App. 4th 842, 849 (2001) ("arising out of" requires more than "but for" standard but not more than minimal causal connection.); Acceptance Ins. Co. v. Syufy Enterprises, 69 Cal. App. 4th 321, 328 (1999) (same). Thus, the Lexington Policy includes coverage for accidents with an "incidental relationship" to the operation of the pump.

It is undisputed that the concrete pumper truck was set up in order to pump concrete and had been pumping concrete for nearly two hours before the accident.  The only reason that pumper was not pumping concrete at the time of the accident was because the boom was being extended in order to facilitate further concrete pumping. Broadly construed, extending the concrete boom to continue the operation of the pump has an "incidental relationship" to the operation of the pump.  See Syufy, 69 Cal. App. 4th at 328 (minimal causal connection when worker had to pass through defective hatch in order to access work site).  The undisputed facts support a finding that the extension of the boom, as a preparatory

act to the operation of the pump, bore a minimal causal
connection to the accident.  Accordingly, under the
Operations Exception to the Auto Exclusion in the
Lexington Policy, the accident "arose out of the
operation of the pump."  Thus, the accident falls under
the Operations Exception to the Auto Exclusion.

### 3.  Subsidence Exclusion

Lexington argues that even if the accident falls
under the Operations Exception, the accident is excluded
under the Subsidence Exclusion.  Wausau argues that the
Subsidence Exclusion does not apply because (1) the
Subsidence Exclusion does not specifically exclude
coverage for damages arising from "bodily injury"; and
(2) the language of the exclusion is ambiguous and thus
must be resolved in favor of the insured.

The Lexington Subsidence Exclusion states, "This
policy does not provide <u>coverage</u> and the Company (or
Insurer or We, if applicable) will not pay any defense
expenses, claim expenses and/or <u>any damages</u> or losses, or
any other loss,·cost or expense, including, but not
limited to losses, costs, or expenses related to, arising
out of, based upon, attributable to, associated with,
caused directly or indirectly by, or contributed to, or
aggravated by 'subsidence.'"  (Lexington Policy at 0039
(emphasis added).)  Although the Subsidence Exclusion
does not specifically list damages from "bodily injury,"

35

the exclusion does states that it does not "provide
coverage" and will not pay "any damages."  "Coverage" and
"damages" are not specifically defined in the definitions
section of the Lexington Policy, and thus Wausau argues
that the Subsidence Exclusion is ambiguous.

     "Language in a contract must be interpreted as a
whole," (MacKinnon, 31 Cal. 4th at 647) and must be read
in its ordinary sense, "any ambiguity cannot be based on
a strained interpretation of the policy language."
Producers Dairy Delivery Co., 41 Cal. 3d at 912.  Section
I of the Lexington Policy addresses "Coverages."
(Lexington Policy at 0011.)  Sub-section A of Section I -
Coverages, is titled "Coverage A. Bodily Injury and
Property Damage Liability" and sub-section B is titled
"Coverage B. Personal and Advertising Injury Liability."
(Id. at 0011-12.)  Under Sub-section A, the policy states
it will pay "those sums that the insured becomes legally
obligated to pay as damages because of 'bodily injury' or
'property damages' to which this insurance applies."
(Lexington Policy at 0011 (emphasis added).)  Similarly,
sub-section B refers to "those sums that the insured
becomes legally obligated to pay as damages because of
'personal and advertising injury' to which this insurance
applies."  (Lexington Policy at 0020 (emphasis added).)
Thus, it is clear that the Subsidence Exclusion's
reference to "coverage" and "any damages" includes the
types of damages listed under the coverage section of the

policy.  Wausau's argument that the broad limit of
coverage for "any damages" should be limited to property
damages is not consistent with the plain meaning of the
words in the Subsidence Exclusion or an interpretation of
the contract as a whole.  Thus, by including the terms
"coverage" and "any damages," the plain language of the
Subsidence Exclusion includes damages related to a
"bodily injury."[17]

Next, the Court analyzes whether the Subsidence
Exclusion applies to this accident.  The language in the
exclusion is broad and applies to "any damages":

related to, arising out of, based upon,
attributable to, associate with, caused directly
or indirectly by, or contributed to, or
aggravated by "subsidence" regardless of any
other cause, event, material, product and/or
building component that contributed concurrently
or in any sequence to that loss.

(Lexington Policy at 0039.)

The definition of "subsidence" is similarly broad,
defined as:

---

[17]The Court notes that the language in subsidence
exclusions is often explicitly limited to "property
damages," but that does not mean that a subsidence
exclusion may never apply to damages arising out of
"bodily injury."  See Cmty. Redevelopment Agency v. Aetna
Cas. & Sur. Co., 50 Cal. App. 4th 329, 336 (1996)
(example of subsidence policy excluding damages arising
from bodily injury and property damage).

earth movement of any kind whatsoever, including
but not limited to earthquake, landslide, "mine
subsidence," "sinkhole collapse," earth sinking;
rising or shifting, mud flow, expansion,
contraction, consolidation, freezing, thawing,
settling, falling away, caving in, eroding,
flowing, tilting, or other movement,·of land,
earth or mud.

Wausau argues that the exclusion should be construed
narrowly to apply only to the "traditional type of earth
movement calamity" and that it was only "intended to
apply to the cost of stabilizing land after an earth
movement calamity." (Pl.'s Reply at 8.)  In addition,
Wausau identifies several examples of incidents that it
believes would fall under the Subsidence Exclusion, _i.e._,
if Rick Concrete caused an earth movement and incurs
liability as a result, or if Rick Concrete exacerbates
damage caused by an earth movement.  Based on these
possibilities Rick Concrete argues the exclusion is
ambiguous because there are many possible scenarios to
which it may apply.  (Pl.'s Opp'n at 16.)

To adopt Wausau's interpretation, however, would
ignore the plain language of the Subsidence Exclusion,
which broadly excludes damages caused by "earth movement
of any kind whatsoever."  Typically, "contracts - even
insurance contracts - are construed to avoid rendering

terms surplusage."   ACL Technologies, Inc. v. Northbrook
Prop. & Cas. Ins. Co., 17 Cal. App. 4th 1773, 1785
(1993).   Wausau's interpretation of the Subsidence
Exclusion is contrary to the plain language of the
exclusion, and would require ignoring several provisions.
Furthermore, that an exclusion may apply in a variety of
situations does not necessarily render it ambiguous.
Wausau seems to suggest that it must only apply to one of
the several possible scenarios it identifies, when in
fact the exclusion could simply apply to all.

The Cal/OSHA Report describes the accident as caused
when "the soil under the left front outrigger failed to
support the load." (Cal/OSHA Report at 0145.)  The
Report finds that the soil under the left front outrigger
had not been properly prepared, and thus the "placement
of a compacted fill over the native soil failed" and the
"the bearing capacity of soil under the left front
outrigger failed to support the load."  (Id. at 0145-46.)
In other sections, the Report concludes that "the soil
under the left front outrigger did not hold the load
imposed by the concrete pumper"; the "soil could not
support the load"; the "outrigger sank"; and finally,
that the "outrigger punctured through the soil."  (Id. at
0140, 0144- 0145.)  These uncontradicted conclusions in
the Cal/OSHA Report support Lexington's argument that
"earth movement" or "sinking" "contributed to" the
accident.   Indeed, the accident would likely not have

1  occurred if the outrigger was not placed on soil.  (Super

2  Ct. Trial Transcript at 0118.)  Accordingly, the accident

3  falls under the Subsidence Exclusion and is not covered

4  by the Lexington Policy.

5

6  **D.  Lexington's Duty to Defend and Indemnify**

7      Wausau seeks an equitable contribution from Lexington

8  to cover the costs of defending and settling the Guillen

9  Action.  "Equitable contribution apportions costs among

10 insurers sharing the same level of liability on the same

11 risk as to the same insured, and is available when

12 several insurers are 'obligated to indemnify or defend

13 the same loss or claim, and one insurer has paid more

14 than its share of the loss or defended the action without

15 any participation by the others.'"  Safeco Ins. Co. of

16 Am. v. Superior Court, 140 Cal. App. 4th 874, 879 (2006)

17 (quoting Maryland Cas. Co. v. Nationwide Mut. Ins. Co.,

18 81 Cal. App. 4th 1082, 1089 (2000)).

19

20     When a settling insurer seeks an equitable

21 contribution from a nonparticipating insurer for the

22 costs of defense, the settling insurer bears the burden

23 of establishing that the nonparticipating insurer had a

24 duty to defend.  Id.  Generally, "[a] liability insurer

25 owes a broad duty to defend its insured against claims

26 that create a potential for indemnity."  Nat'l Steel

27 Corp. v. Golden Eagle Ins. Co., 121 F.3d 496, 499 (9th

28 Cir. 1997) (citing Montrose Chemical Corp. of Cal. v.

1  <u>Superior Court</u>, 6 Cal. 4th 287, 295 (1993)).  The

2  insurer's duty to defend arises immediately upon notice

3  of a covered claim against its insured if the facts known

4  to the insurer indicate a potential or possibility for

5  indemnity.  <u>Id.</u>  "An insurer has no duty only if, at the

6  time of its decision, it can prove that the claim cannot

7  fall within policy coverage."  <u>Id.</u>

8

9      "When a duty to defend is shown, nonparticipating

10 coinsurers are presumptively liable for both the costs of

11 defense and settlement."  <u>Safeco Ins. Co. of Am.</u>, 140

12 Cal. App. 4th at 880.  A settling insurer has met its

13 burden of proof against a nonparticipating insurer when

14 it makes a "prima facie showing of coverage under the

15 nonparticipating insurer's policy – the same showing

16 necessary to trigger the recalcitrant insurer's duty to

17 defend."  <u>Id.</u>  Once the settling insurer has made a prima

18 facie showing, the burden of proof then shifts to the

19 nonparticipating insurer to prove the absence of actual

20 coverage.  <u>Id.</u> at 881.  As discussed above, Lexington has

21 demonstrated the accident falls under the Subsidence

22 Exclusion, and thus there is no coverage under the

23 Lexington Policy and Lexington is not required to

24 contribute to costs of settling the <u>Guillen</u> Action.

25

26      Nevertheless, Wausau will be entitled to an equitable

27 contribution for the costs of defending the action if

28 Lexington owed a duty to defend.  <u>See</u> <u>Wausau Underwriters</u>

1 Ins. Co. v. Unigard Sec. Ins. Co., 68 Cal. App. 4th 1030,

2 1047 (1998) ("An insurer may have a duty to defend even

3 when it ultimately has no obligation to indemnify, either

4 because no damages are awarded in the underlying action

5 against the insured or because the actual judgment is for

6 damages not covered under the policy."). Lexington

7 argues it never owed a duty to defend because the

8 Lexington Policy only provides excess coverage for the

9 accident.[18]   Lexington argues it is an excess policy under

10 California Insurance Code section 111580.9(d) and

11 pursuant to the "Other Insurance" clause in its Policy.

12

13 **1.   California Insurance Code Section 11580.9(d)**

14 Lexington argues that its Policy is conclusively

15 presumed to be excess under California Insurance Code

16 section 11580.9(d) because the Wausau Policy "describes

17 or rates" the concrete pumper truck involved in the

18 accident.  (Def.'s Mot. at 25 n.2.)  Lexington requested,

19 pursuant to Federal Rule of Civil Procedure 56(d),

20 additional time to conduct discovery on this issue as it

21

22 _____

23 [18]At the hearing, Lexington argued that it owed no
duty to defend because the Subsidence Exclusion, which
applies to this accident, includes language excluding

24 "all costs," including costs related to defending any
action.  Even accepting this interpretation of the phrase

25 "all costs" as accurate, Lexington would still have to
demonstrate that at the time it refused to provide a

26 defense it could prove that the claim could not fall
within the policy coverage.  Lexington has not met this

27 burden as it was certainly possible, at the time Rick
Concrete tendered the action, that the accident could

28 fall within the Policy, triggering Lexington's duty to
defend.

is not satisfied with Wausau's response to its request
for production.   Specifically, Lexington seeks to depose
Sonya Lopez, the Underwriting Manager for Liberty Mutual
Business Insurance in the Pacific Region, in order to
"investigate" Ms. Lopez's declaration, which states that
the concrete pumper truck was not listed as an insured
vehicle in the Wausau Policy and Wausau did not collect a
premium for the truck.[19]

Wausau contends further discovery is unnecessary
because the Lopez Declaration is sufficient.   Moreover,
Wausau argues that section 11580.9(d) is inapplicable
because the Lexington Policy does not "apply to" the
concrete pumper truck, it only applies to the "pump"
attached to the truck.   (Pl.'s Reply at 11.)

Section 11580.9(d) provides that "where two or more
policies affording valid and collectible liability
insurance apply to the same motor vehicle or vehicles in
an occurrence out of which a liability loss shall arise,
it shall be conclusively presumed that the insurance
afforded by that policy in which the motor vehicle is
described or rated as an owned automobile shall be
primary and the insurance afforded by any other policy or

---

[19]Lexington seeks additional time to investigate the
Lopez declaration because it was received less than one
week before the deadline to file an opposition to
Wausau's Motion and the Declaration purports to be
executed one day after it was sent.  (Clairbourne Decl. ¶
13.)

1  policies shall be excess." Cal. Ins. Code § 11580.9(d).

2  "In determining whether section 11580.9, subdivision (d),

3  applies, the deciding factor is not the type of policy

4  involved but whether it affords valid and collectible

5  liability insurance that applies to the motor vehicle

6  involved in the accident." <u>Scottsdale Ins. Co. v. State</u>

7  <u>Farm Mut. Auto. Ins. Co.</u>, 130 Cal. App. 4th 890, 903

8  (2005).

9

10      In <u>Scottsdale</u>, the California Court of Appeal

11  considered whether a general commercial liability policy

12  "applied to" a truck with a mounted cherry picker for the

13  purposes of section 11580.9(d).  130 Cal. App. 4th at

14  904.  The language in the CGL policy at issue in

15  <u>Scottsdale</u> is almost identical to the language in the

16  Lexington Policy.  Like the Lexington CGL Policy, the

17  Scottsdale CGL policy excluded coverage for injuries

18  "arising out the ownership, maintenance, use, or

19  entrustment to other of any 'auto,'" but provided

20  coverage for "'[b]odily injury' arising out of the

21  operation of any of the equipment listed in paragraph

22  f.(2) or f.(3) of the 'definition of mobile equipment.'"

23  <u>Id.</u>  As in the Lexington Policy, paragraph f.(2) of the

24  Scottsdale policy lists "[c]herry pickers and similar

25  devices mounted on automobile or truck chassis and used

26  to raise or lower workers."  <u>Id.</u>

27

28

The Scottsdale court analyzed whether, in light of
this language in the policy, the CGL policy "applied to"
a truck with a mounted cherry picker.  The court found
that based on the provisions in the policy, it was clear
that "the Scottsdale policy does not provide liability
insurance for the truck involved in the incident.  It
provides liability insurance for the cherry picker
mounted on the truck."  Id.  Here, as in Scottsdale, the
Lexington Policy does not provide insurance coverage for
the concrete pumper truck, rather, it provides insurance
coverage for the operation of the "pump."  (See Lexington
Policy at 0027.)  Accordingly, even if the Wausau Policy
did in fact "describe or rate" the concrete pumper truck,
section 11580.9(d) does not determine the priority of the
policies because the Lexington Policy does not "apply to"
the same vehicle, it only applies to the "pump."
Therefore, the Court denies Lexington's request for
additional discovery under Rule 56(d).

## 2.   Other Insurance Clauses

Next, Lexington contends it had no duty to defend
because the Policy only provides excess coverage for this
particular accident.  There is a distinction between
primary and excess insurance coverage.  "Primary coverage
is insurance coverage whereby, under the terms of the
policy, liability attaches immediately upon the happening
of the occurrence that gives rise to liability . . .
'Excess' or secondary coverage is coverage whereby, under

1   the terms of the policy, liability attaches only after a

2   predetermined amount of primary coverage has been

3   exhausted." <u>Century Sur. Co. v. United Pac. Ins. Co.</u>,

4   109 Cal. App. 4th 1246, 1255 (2003) (quoting <u>Olympic Ins.</u>

5   <u>Co. v. Employers Surplus Lines Ins. Co.</u>, 126 Cal. App. 3d

6   593, 597-98 (1981) (original italics omitted)).  Excess

7   coverage refers to secondary insurance that "provides

8   coverage after other identified insurance is no longer on

9   the risk." <u>Am. Cas. Co. of Reading, PA. v. Gen. Star</u>

10   <u>Indem. Co.</u>, 125 Cal. App. 4th 1510, 1521 (2005) (quoting

11   <u>Century Sur. Co.</u>, 109 Cal. App. 4th at 1255).  "The

12   identification of the underlying primary insurance may be

13   as to (1) a particular policy or policies that are

14   specifically described or (2) underlying coverage

15   provided by a particular and specifically described

16   insurer." <u>Id.</u>

17

18     In support of its argument that it is an "excess

19   policy," Lexington points to the "Other Insurance" clause

20   in Section V, "CONDITIONS" of its Policy.  The "Other

21   Insurance" clause provides that if there exists other

22   valid and collectible insurance, the Lexington Policy

23   provides excess coverage if the loss arises out of the

24   maintenance or use of an "auto," to the extent that loss

25   is not excluded under the Auto Exclusion.  The Wausau

26   Policy also contains an "Other Insurance" clause, which

27   provides that the Wausau Policy provides excess coverage

28

1  for any covered "auto" not owned by the insured.[20]  In

2  addition, the Wausau and Lexington policies both contain

3  clauses governing the method of sharing the costs of

4  defense and indemnification when more than one insurer

5  provides excess or primary coverage.

6

7     An "other insurance" clause purporting to reduce

8  primary coverage to excess coverage is distinguishable

9  from a true "excess" or secondary coverage policy.  There

10  are several types of "other insurance" clauses that

11  attempt to limit a primary insurer's liability.  The

12  first type is a "pro rata" clause, which attempts to

13  limit the insured's liability to "the total proportion

14  that its policy limits bears to the total coverage

15  available to the insured." Century Sur. Co., 109 Cal.

16  App. 4th at 1255-56 (quoting Commerce & Indus. Ins. Co.

17  v. Chubb Custom Ins. Co., 75 Cal. App. 4th 739, 743

18  (1999)); Croskey et al., Cal. Practice Guide: Insurance

19  Litigation (2013) § 8:16 ("Rutter Insurance Litigation").

20  The second type is an "excess only" clause, which

21  requires "exhaustion of other insurance; in effect, this

22  insurer does not provide primary coverage but only acts

23  as an excess insurer." Id. (quoting Commerce & Indus.

24  Ins. Co, 75 Cal. App. 4th at 743); see also Rutter

25  Insurance Litigation § 8:19.  The third type is an

26

27     ──────────────────
        [20]An "auto" is "owned" for the purposes of the policy
28  if it is "leased, hired, rented, or borrowed." (Wausau
    Policy at 0096.)

47

1   "escape" clause, which "extinguishes the insurer's

2   liability if the loss is covered by other insurance."

3   Id. (quoting Commerce & Indus. Ins. Co., 75 Cal. App. 4th

4   at 743); see also Rutter Insurance Litigation § 8:20.

5

6       Generally, contractual terms of an insurance policy

7   are honored whenever possible.  Fireman's Fund Ins. Co.

8   v. Maryland Cas. Co., 65 Cal. App. 4th 1279, 1305 (1998).

9   Thus, courts may honor other insurance clauses "when no

10  prejudice to the interests of the insured will ensue."

11  Id.; Hartford Cas. Ins. Co. v. Travelers Indem. Co., 110

12  Cal. App. 4th 710, 724 (2003).  "Escape" clauses,

13  however, are a type of "other insurance" clauses that are

14  generally disfavored as against public policy because

15  they allow an insurance company to "avoid the risk it was

16  paid to cover" when other insurance exists.  See Dart

17  Indus., Inc. v. Commercial Union Ins. Co., 28 Cal. 4th

18  1059, 1080 (2002); Edmondson Prop. Mgmt. v. Kwock, 156

19  Cal. App. 4th 197, 204 (2007). "Excess only" clauses in

20  primary liability policies are usually considered to be

21  the functional equivalent of "escape" clauses and

22  therefore are also treated with disfavor.  Dart, 28 Cal.

23  4th at 1080; Fireman's Fund Ins. Co., 65 Cal. App. 4th

24  1279.

25

26      "When two primary insurance policies contain

27  conflicting 'other insurance' clauses, courts may

28  override 'excess only' clauses and instead prorate the

48

costs of liability and defense according to the amount of coverage afforded by the policy.  Dart, 28 Cal. 4th at 1080 ("the modern trend is to require equitable contributions on a pro rata basis from all primary insurers regardless of the type of 'other insurance' clause in their policies."); Commerce & Indus. Ins. Co., 75 Cal. App. 4th at 745 ("Because these types of provisions are disfavored, courts have developed a method of overriding them — When two or more applicable policies contain such clauses, both liability and the costs of defense should ordinarily be prorated according to the amount of coverage afforded.") (internal quotations omitted); Travelers Prop. Cas. Co. of Am. v. Safeco Ins. Co. of Illinois, 468 F. App'x 689, 692 (9th Cir. 2012) ("Where primary insurance policies contain conflicting excess clauses, the clauses are disregarded and the insurers must share in the defense and indemnity costs on a pro-rata basis.").  A pro rata solution is only appropriate when the policies insure the same risk and operate on the same level of coverage, i.e., two primary insurance policies apply to the same damage or loss. Commerce & Indus. Ins. Co., 75 Cal. App. 4th at 745.

     In determining whether to enforce an "excess only" clause, the Court considers "varying equitable considerations which may arise, and which affect the insured and the primary and excess carriers, and which depend upon the particular policies of insurance, the

49

nature of the claim made, and the relation of the insured to the insurers." <u>Fireman's Fund Ins. Co.</u>, 65 Cal. App. 4th at 1305; <u>Hartford Cas. Ins. Co.</u>, 110 Cal. App. 4th at 725 (applying equitable considerations and affirming decision to enforce "excess only" clause because it was a narrow exception to the policy's operation as a primary policy).

The Coverage section of the Lexington Policy states that it will pay damages and defend the insured against any "bodily injury" to which the insurance applies. Coverage is not explicitly conditioned on the exhaustion of any underlying insurance, nor does it specifically identify any other insurance policies that must be exhausted before coverage applies.[21] <u>See</u> <u>Century Sur. Co.</u>, 109 Cal. App. 4th at 1255. The plain language of the coverage provisions of the Lexington Policy state that the Lexington Policy is primary, and thus Lexington had an immediate duty to defend. Accordingly, unless the Court enforces the "Other Insurance" clause, converting Lexington's coverage to excess, Lexington must contribute

---

[21]At the hearing, Defense counsel cited to <u>Hartford Accident & Indem. Co. v. Sequoia Ins. Co.</u>, 211 Cal. App. 3d 1285, 1302 (1989), in support of his argument that the Lexington Policy only provides excess coverage. In <u>Sequoia</u>, the policies that were identified as "excess" policies specifically limited coverage to amounts in excess of "underlying insurance." 211 Cal. App. 3d at 1292-93. As the Lexington Policy contains no such limitation, <u>Hartford</u> supports treating both the Lexington and Wausau policies as primary absent a statutory presumption changing the priority of the policies or equitable enforcement of the "other insurance" clause.

to the costs of defending the Guillen Action.  See
Fireman's Fund Ins. Co., 65 Cal. App. 4th at 1305 ("Thus,
although a true excess insurer - one that is solely and
explicitly an excess insurer providing only secondary
coverage - has no duty to defend or indemnify until all
the underlying primary coverage is exhausted or otherwise
not on the risk, primary insurers with conflicting excess
'other insurance' clauses can have immediate defense
obligations.").

     The Other Insurance clauses in the Lexington and
Wausau Policies are both "excess only" clauses in that
they covert the insurer's primary coverage to excess
coverage in specific instances where other insurance
exists.  The Wausau and Lexington policies also provide
that when the insurers are primary, they are entitled to
pro rata contribution from other insurance companies that
also provide coverage.  As explained above, in this
situation courts generally decline to enforce an "excess
only" clause and instead require equitable contributions
on a pro rata basis from all primary insurers.
Nevertheless, courts have enforced "excess only" clauses
when the clause applies narrowly to specified instances,
the clause does not conflict with a similar clause in
another policy or offend public policy, and the clause
does not infringe on any rights of the insured.  Hartford
Cas. Ins. Co., 110 Cal. App. 4th at 727; see also
California State Auto. Ass'n Inter-Ins. Bureau v.

<u>Progressive Cas. Ins. Co.</u>, 2012 WL 1438835, at *3 (N.D. Cal. Apr. 25, 2012) ("Progressive"); <u>Peerless Ins. Co. v. St. Paul Surplus Lines Ins. Co.</u>, 2010 WL 2486795, *7-10 (S.D. Cal. June 15, 2010) (enforcing "excess only" clause when "[t]he policies are not in conflict, the insured is not prejudiced as it still receives full defense and indemnity, and both [the insurers] are providing coverage to the extent expressly set forth in their policies" and the inequities did not override the unambiguous language in the policy.).

In <u>Hartford</u>, the California Court of Appeal upheld the equitable enforcement of an "excess only" clause in a primary insurance policy.  In that case, Hartford Casualty Insurance Company ("Hartford") filed a declaratory relief action against Travelers Indemnity Company ("Travelers") seeking a determination that, pursuant to Hartford's "other insurance" clause, Hartford did not owe the insured a duty to defend or indemnify and was entitled to reimbursement from Travelers for all costs expended in defending and indemnifying the underlying claim.  Hartford's "excess only" clause provided that the policy was primary except in limited instances pertaining to fire insurance and additional insureds.  <u>Id.</u> at 726.  The Travelers policy also contained an "excess only" clause converting its coverage to excess when there exists other insurance for fire,

extended coverage, builder's risk, or when the insured was an additional insured under another policy.

The court noted that Hartford's "excess only" clause did not purport to make the policy excess whenever other insurance exists to cover the loss.  Instead, the clause only applied in limited situations and thus did not actually serve as the type of "escape" clause that is offensive to public policy.  The court further noted that the Hartford "excess only" clause did not conflict with the Travelers' "excess only" clause in such a way that the insured would be left without coverage.  <u>Id.</u> at 727. Finally, the <u>Hartford</u> court concluded that, "[b]ecause the policy terms, as they apply in this case, do not conflict or offend public policy and do not infringe on any rights of the insured, there is no reason to disregard the express terms of both policies."[22]  <u>Id.</u>

_____

[22]Similarly, in <u>Progressive</u>, a magistrate judge in the United States District Court for the Northern District of California enforced an "excess only" clause in a primary watercraft policy that provided excess coverage in instances where a non-covered watercraft was involved.  2012 WL 1438835 at *4-5.  The court concluded there was no equitable reason to override the express language of the "excess only" clause because the clause applied to a limited and specific circumstance, did not conflict with the other insurance clause at issue in the homeowner's insurance policy in such a way as to deny coverage to the insured, and was not against public policy.  <u>Id.</u>

Here, as in <u>Hartford</u>, the relevant sub-clause of the Lexington Policy's "excess only" clause is very narrow.[23] It states that the Policy provides excess coverage when the loss falls under the Operations Exception of the Auto Exclusion, <u>i.e.</u>, when the loss arises out of the use of an "auto," but is not excluded under the Lexington Auto Exclusion.  This is a narrow limitation that, unlike a traditional "escape" clause, does not attempt to eliminate all of Lexington's primary coverage in the presence of other insurance.

The Wausau Policy also includes an "excess only" clause that limits its primary coverage to situations where the covered vehicle is not owned by the insured. Thus, the Lexington "excess only" clause does not conflict with the Wausau "excess only" clause in such a way that Rick Concrete is prejudiced or left without coverage.  Furthermore, the "excess only" clause applies to a situation where it is likely the insured has acquired specific other insurance, such as automotive liability insurance, to cover the loss at issue and may not dependant on the Lexington Policy.  Thus, in this specific action, there is no equitable reason to override

_____

[23]This determination is limited to the clause applicable in this case.  The court does not determine whether other sub-clauses in the Other Insurance clause may be sufficiently narrow to justify enforcement in some circumstances.

the express language of the Lexington Policy.[24]
Accordingly, Lexington is not required to reimburse
Wausau for the costs of defending the _Guillen_ Action.

### V.   CONCLUSION

For the foregoing reasons, the Court GRANTS
Lexington's Motion and DENIES Wausau's Motion.


Dated:  August 19, 2014

VIRGINIA A. PHILLIPS
United States District Judge

---

[24]It is possible the equities would weigh against
enforcement of this sub-clause in a different factual
scenario.